## KOVALICKY et v ISTVANIK et

Ohio Appeals, 7th Dist, Mahoning Co

Decided Aug 30, 1935

Dan P. Conway, Youngstown, for plaintiffs.

John Willo, Youngstown, and W. P. Barnum, Youngstown, for defendants.

However, there is before the court a bill of exceptions consisting of hundreds of pages, four separate depositions, a large number of briefs dealing with the issues involved which include the history of the Catholc Church extending into the past for hundreds of years. The plaintiffs claim that the defendants have refused to allow these plaintiffs and others the right to hold services in the church in question according to the Articles of Incorporation. We find no evidence wherein the plaintiffs, save and except one Rev. Victor Kovalicky, have been denied the right to hold services within the church. Rev. Kovalicky was refused such right for the reason that he had not and would not be confirmed as their pastor, neither had he been nominated as pastor by the congregation. After a perusal of the record we are unable to find that the defendants are attempting to set themselves up as an independent church; in fact, they allege in their answer the very contrary and the testimony in the record is to that effect. Neither do we find that defendants are attempting to change the Articles of Incorporation to divert the property and assets to themselves as an independent church, but rather a dispute as to whether the congregation has the right to nominate, confirm or reject a pastor duly appointed by the Bishop, when such appointment has been made prior to and in the absence of such nomination by the congregation.

It appears that Europeans of Rusin birth have migrated to the United States in recent years and many of them settled in the Mahoning Valley, residing largely in East Youngstown, now known as Campbell. It also appears that Mr. Michael's Greek Catholic Rusin Congregation or church is an incorporated organization, by virtue of an Ohio Charter, dated August 21, 1922, its purpose clause being as follows:

"Said corporation is formed for the purpose of providing a place of worship for its members and conducting the same according to the rites, customs, doctrines, rules and regulations of the Greek Catholic Church, united with the Holy See of Rome; of promoting the cause of the said Greek Catholic religion, of maintaining and conducting a parish school for children of said denomination, of receiving, holding and disbursing gifts and bequests and funds arising from other sources, of acquiring, holding and maintaining suitable real estate and buildings and the doing of all things necessary or incident thereto."

## OPINION

By CARTER, J.

At first blush it might appear that the solution of this problem is not difficult.

The congregation also adopted by-laws for its guidance.

Has the congregation or church in question the right to nominate their pastor or confirm or reject one duly appointed by the Bishop where such appointment has been made in the absence of such action on the part of the congregation? The corporation is the owner of the church property in question and other real estate, which property stands in the name of the Corporation and had at the time of the institution of this action some eight thousand dollars on deposit in two banks located in the city of Youngstown. The property was purchased and paid for by the members of the church through their own efforts, title taken in the name of the corporation, and its accumulations were brought about in the same manner. They maintain their church through their own efforts and pay their pastor in the same way.

As in all litigation, we find the testimony in the record conflicting. Included in the record is the testimony of some of the leading scholars of the church, not only in this country but from foreign lands as well, and the record discloses that for hundreds of years a portion of the members of the Catholic Church were in schism; that is, rebelled and withdrew from the church, and among these schismatics were predecessors of the members of the church in question, and it further appears quite conclusively from the record and from admissions found therein, that in about 1646 there was a union effected between these schismatics and the Latin or western church, in which a portion of those in schism returned to the Latin church. This union is known historically as the Compact of Ungvar. It also appears from the record that at the time of return of the schismatics they were permitted to retain many rights, privileges and immunities which they had enjoyed prior to the Union and among some of these rights were the following, as enumerated in defendants' Exhibits 1 and 2:

"First—That the returning schismatics be allowed to keep the Greek rite.

Second—To have the Bishop by them chosen and confirmed by the Apostolic See.

Third—To use freely the Ecclesiastical immunities."

And it appears from the record that there were many other rights and privileges which they were permitted to retain in addition to the ones above enumerated. Do any of these enumerated rights, privileges and immunities found in the Compact of Ungvar include the right, power or privilege of a Rusin Congregation to nominate a pastor for their parish or to refuse to accept a pastor or priest duly appointed by the Bishop, having jurisdiction over such church? We will discuss these enumerated rights and reservations in the inverse order in which they appear, as it is one of the claims of the defendants that the right of jus patronatas is included in the rights and reservations found in the Ungvar Compact. As to reservation No. 3, namely, "to use freely the Ecclesiastical immunities." This enumerated reservation can have no bearing directly or indirectly on the issues involved as this reservation applies solely to immunities granted the priests only, and has no reference to the rights of the congregation such as the one in question, to nominate, reject or confirm a priest appointed by the Bishop. Neither can the second reservation be made applicable as this reservation deals with the election of a Bishop and confirmation thereof by the Apostolic See. We are therefore confined to reservation No. 1—"That the schismatics be allowed to keep the Greek Rite." In the light of the record and in the lights of history of the church, we have no hesitation in holding that when the schismatics came back into the union with the Occidental church, they came back with the understanding and agreement with the Apostolic See that the privilege of the retention of the Greek rite would be recognized, together with certain other privileges, and we are further satisfied that whatever rights were permitted to be retained by the Uniates at the time of the union are preserved to them wheresoever they migrate and remain such until at least modified or revoked by proper church authority.

Now, what is embraced in the condition or reservation that "the Uniates be allowed to keep the Greek Rite"? The testimony of students of Catholic Church history disagree as to its interpretation, meaning and scope. Testimony of witnesses on behalf of plaintiffs is to the effect that the Congregation has no right or privilege under any of the rights or reservations in the Compact of Ungvar to select, that is to designate for appointment, a priest or refuse a Bishop's appointee; while testimony of witnesses on behalf of defendants is of contrary tenor—that such were recognized rights for hundreds of years prior to the Compact of Ungvar, that at the time of union they were permitted to retain these rights and have exercised them ever since. We have read this entire record from cover to cover and a goodly portion of same

a second time, and if such a right does exist, it must be by virtue of jus patronatas or the law of patronage. There is no doubt that the law of patronage, and its effect existed in the Oriental church prior to the Compact of Ungvar and without doubt in the Occidental church as well. The right of jus patronatas, and privileges flowing therefrom, was established and permitted to be exercised during the early years of the church by reason of gifts or donations, and the person or persons who made gifts to the church had voice relative to the priest who was to officiate in that particular church, and this appears to have been a recognized right. The barons and lords, who established and maintained churches at their expense, had something to say with reference to the selection and appointment of their priests, and it is the claim of the defendants that when the people themselves came into ownership of the land in the place and stead of the lords and barons, and constructed a church at their own expense and maintained and supported its pastor, they had the power and right to select, that is to nominate, their pastors or to confirm or reject those designated by the Bishop.

Lexicographers define a rite as follows:

"A formal or ceremonial act or procedure prescribed or customary in religious or other solemn use, such as baptism, marriage, burial, sacrificial rite."

We do not agree with defendants' contention that the selection, confirmation or rejection of a priest comes or is included within the scope or definition of "rite," and the privilege of the congregation, if such there be, of designating, confirming or rejecting a priest duly appointed by the Bishop is not included in this written reservation. We therefore, hold that the rights emanating from the principle of patronage are not included in any of the written reservations contained in the Compact of Ungvar.

However, it is claimed by the defendants that the Holy See permitted the Uniates to enjoy all the rights and privileges which they were enjoying at the time of the union, as long as the exercise of such rights and privileges were not contrary to dogma, morals or faith of the Catholic Church. This is admitted in a number of instances in the record by witnesses testifying on behalf of the plaintiffs and it is apparent that the nomination, confirmation or rejection of a priest is in no way contrary to dogma, morals or faith, but more in nature disciplinary or regulatory. Plaintiffs' witnesses admitted that the principle involved in the doctrine of jus patronatas is not in violation of Catholic dogma, morals or faith. One of the principal witnesses testifying on behalf of plaintiffs admitted that once one returns to the Catholic Church." Whether these rights and immunities he had may be retained by him, provided they are not contrary to faith or morals, and he further stated: "When our forefathers came back in 1646, they retained the rights and privileges that they had, but with the restriction that they were not contrary to faith and morals of the Catholic Church." Whether these rights and privileges were accorded them through the written Compact of Ungvar or otherwise, or whether the principle of jus patronatas was included in the written reservations appears to the court to be immaterial, as the record further discloses that there were many other rights and privileges permitted to remain to the Uniates on their return not enumerated in the written Compact and not included in any one of the written reservations, provided they were not contrary to the Catholic doctrine, which privileges they have enjoyed since the Union to the present time, which were not permitted in the Latin or western church. The record further discloses by the greater weight of the evidence that jus patronatas and the privileges flowing therefrom was and has been a custom and a privilege that the Oriental church enjoyed for such a length of time preceding as well as subsequent to the Compact of Ungvar as to have become an established principle of the Oriental church and has been recognized by various Holy Fathers since the Compact and was so recognized by Bishop Ortinsky when he officiated as First Bishop of the Ruthenians in this country from 1907 to 1916, Bishop Ortinsky being the immediate predecessor of the present Bishop.

We are satisfied from the perusal of this record that jus patronatas and the rights flowing therefrom was a privilege enjoyed by the Oriental church prior to the Union and has been recognized since the Union by many of the Holy Fathers, that when a congregation such as the one in question owns its property, maintains the church at its expense, compensates the pastor for his services that such a congregation has the right to designate or in other words nominate the priest who is to officiate therein, and by parity of reasoning if such congregation has the right to nominate their priest and in the event this right has been ignored and an appointment is made

without such right being recognized, such congregation has the undoubted right as a corollary to reject a pastor who has not prior thereto been nominated, or. in other words, selected by the congregation. The nomination by the congregation and the right of the Bishop to appoint being mutual rights enjoyed by both church and Bishop.

The canon law or law of the church has been brought to our attention. There is evidence in the record that the Holy See by a certain bull or decree, has heretofore abolished patronage by the promulgation of Canon No. 1450. This canon as translated reads:

"No right of patronage under any title can be validly established in the future."

In the promulgation of this canon it is quite evident that the right of patronage existed prior thereto. However, it is to be observed that the canon law of the Latin or western church does not in its entirety oblige or obligate the Oriental church. Canon No. 1 provides:

"That although in this Code of canon law the discipline of the Oriental church is also frequently referred to, nevertheless this Code refers to the Latin church alone, nor does it oblige the Oriental church unless it deals with those matters which by the very nature of the case also affect the Oriental church."

Dr. Bartlett, witness for plaintiffs, defines that expression—"their very nature affect also the latter," as referring to natural and divine positive law, and that this expression found in Canon 1, refers to such.

Cicognant a recognized authority on canon law, says:

"The Oriental church in accordance with time-honored practices have their proper discipline which has been recognized without question by the Holy See."

One of the principal witnesses testifying on behalf of plaintiffs subscribed to this doctrine. The same author further states:

"Undoubtedly, the Orientals are not sub-. ject to the Code. Let this be clearly understood, nor should we speak of the Code as being their proper legislation, but with regard to the above points they are bound by the same ecclesiastical discipline. However, either are not held to changes made by the Code regarding these points nor are they favored by the same unless it is otherwise stated."

Further:

"The Oriental discipline remains then a kind of particular law and as a rule it follows Orientals wherever they may go. We can exempt religious orders having their own laws, and ancient customs which have over and over again been ratified by the Holy See."

And further:

"That the Code presents further proof that the Roman Pontiffs have never done anything which might prove a detriment to the venerable Oriental rite, and that the Holy See has ever sought to safeguard the Greek rite and never thought or intended to abolish it, and so quite fittingly the Oriental Bishops had no part in the preparation of the Code."

The record also discloses that the sacred congregation of the Propaganda in a decree addressed to the Apostolic delegates in the Orient, dated November 8th, 1882, decided that the constitutions of the Holy See are binding upon the Oriental church in the three following cases:

A. If they concern matters of faith and Catholic doctrine.

B. If their subject matter shows that they are binding upon Orientals also, for the reason that they are not Ecclesiastical merely, but declarations of Divine or natural law.

C. If the laws themselves though disciplinary in character explicitly state that they are meant for the Oriental also.

It might be observed that under Canon 1450 providing for abolishment of patronage, no reference whatever is made to the Oriental church. It is therefore clear that if the right of patronage existed prior to the promulgation of this canon, this can in no way affect that right as far as the Oriental church is concerned, as no reference whatever was made therein to the Oriental church, and Sub Section C, supra, provides that the canons do not affect matters disciplinary unless they expressly state that they are meant for the Oriental church.

Doctor Bartlett, one of plaintiffs' chief witnesses, subscribed to the following statement from the Catholic Encyclopedia published in 1909:

"In 1595 the Rusin Bishops of Lithuania and little Russia determined to return and unite with the Holy See and held a council at Brest-Litvosk, at which a decree of

Union was adopted and where they chose two of their number, Ignatius Potsky and Cyril Terlitsky, to go to Rome and take the oath of submission to the Pope. No change in their rites or Calendar was required by Rome, but the whole of ancient liturgy, service and discipline was to go on as before excepting a few schismatic practices."

And it appears by the greater weight of the evidence in this case that the rights, privileges and immunities which were enjoyed by the Oriental church prior to the Union were still preserved to the Uniates as long as the same are not contrary to dogma, faith and morals of the Latin church. And this fact has been reiterated time and again by the Holy Fathers and that these rights not modified or revoked, still remain in the Oriental church until at least modified or revoked by proper church authority.

The case of Rt. Rev. Basil Takach, Bishop of the Greek Catholic Diocese of Pittsburgh, and Trustee of the St. John's Greek Catholic Cathedral v Rev. Peter Molchany, which opinion has been introduced in this case, deals with a case of removal of a priest. There is among the church laws a canon or decree that provides:

"That all rectors of parishes and missions of the Greek Ruthenian church in the United States, are removable at the will of the Bishops of the Greek Ruthenian rite."

It will be observed that in this canon the Greek Ruthenians are designated. In the case at bar we are dealing with the arbitrary and unlimited power of appointment by the Bishop without consideration by the congregation.

It is therefore the conclusion of the court that the right of patronage existed in the Oriental church for hundreds of years prior to the Compact of Ungvar; that certain privileges flowed from that doctrine in a congregation such as the one in question and that one of these privileges was the right to nominate the priest who is to officiate within their parish and where the right is ignored such congregation in a court of equity will not be compelled to accept the appointee in question wherein such congregation has been denied participation as to whom that pastor shall be; that such is in no way contrary to dogma, faith or morals of the Catholic Church, and that by reason thereof it is one of the privileges that was and has been permitted since the Union up to the present time, that this right has been by no church authority modified or revoked as to the Oriental church, and that they still enjoy the right of jus patronatas, inasmuch as the church in question owns its own property, maintains and supports the church at their own expense, and compensates their pastor or priest in the same way.

Coming to this conclusion we find in favor of the defendants on that issue and as to that issue the temporary injunction heretofore granted is dissolved and the petition of plaintiffs dismissed at plaintiffs' costs.

Now, as to the issue between the plaintiffs and Rev. Milly, it is conclusively established by the record that Rev. Milly is an excommunicated priest, and as far as the Catholic church is concerned has the status only of a layman. He is therefore not a priest or pastor authorized to officiate in a Catholic parish. This church is under its charter united with the Holy See, and as we understand no one but a duly ordained and properly acting priest has the right to officiate in that capacity. There is a canon that provides that:

"All rectors of parishes and missions of the Greek Ruthenians in the United States are removable at the will of the Bishops of the Greek Ruthenian Rite. They cannot be removed, however, without grave and just reasons."

And if Rev. Milly was a duly acting priest with proper credentials and was such at the time this action was brought, this court would be compelled to hold that this action is prematurely brought, as the initial step at least, in the way of removal would need be taken by the Bishop. However, we are confronted with the fact that he is not a duly acting and functioning priest. Therefore this canon gives the Bishop no power of removal and it is the view of the court that Rev. Milly has no right under his present status to officiate as a priest or pastor of the church, and that such attempt and his appointment as such pastor, is a violation of the purpose clause of the organization; that a court of equity has jurisdiction to entertain this action as against Rev. Milly. It is therefore ordered, adjudged and decreed that Rev. Milly be, and hereby is, perpetually enjoined from acting as such pastor in St. Michael's Greek Rusin Congregation. Decree accordingly.

ROBERTS and NICHOLS, JJ, concur.